IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CHARMIA CARTER,                *

    Plaintiff,              *

vs.                            *       CASE NO. 4:06-CV-058 (CDL)

NORFOLK SOUTHERN RAILROAD,     *

    Defendant.              *

O R D E R

Plaintiff Charmia Carter ("Plaintiff" or "Carter") filed the above captioned action asserting claims against her former employer, Norfolk Southern Railway Company,[1] under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991. Presently pending before the Court is Defendant's Motion for Summary Judgment on Plaintiff's Complaint (Doc. 27). For the following reasons, this motion is granted.

BACKGROUND

The facts viewed in the light most favorable to Plaintiff are as follows:

**I.   The Parties**

Defendant operates a freight railroad that runs through twenty-two eastern states, the District of Columbia, and Ontario, Canada. The Central Georgia District operates out of Columbus, Georgia. At

---

[1]Plaintiff incorrectly identified Defendant in the caption of her Complaint as "Norfolk Southern Railroad." (*See* Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 1.)

all times relevant to this lawsuit, John Martin, Operations Manager, and Jason Charbonneau, Trainmaster, shared supervisory responsibility over all engineers and conductors in the Central Georgia District.

In May 2005, Plaintiff was hired to work as an Accelerated Conductor Trainee ("ACT"). Conductors are responsible for switching and separating train cars and for building trains by putting different cars together. Upon hire, ACTs must pass a physical examination and background check, as well as complete the ACT training program, which consists of four phases:

> Phase I consists of approximately eight days of classroom training . . . . Phase II consists of approximately four weeks of field training with experienced conductors and engineers . . . . ACTs receive written evaluations from the conductors on each trip. ACTs then . . . attend another eight days of classroom training during Phase III. Phase IV consists of an additional three to four months of field training . . . . The training provided is very important because the conductors have a very dangerous job.

(Charbonneau Decl. ¶ 3, June 22, 2007.) As an ACT, Plaintiff received a salary of $500.00 per week.

## II. Plaintiff's Harassment

On May 2, 2005, Plaintiff went to the Columbus facility to complete the paperwork necessary for her background check. As she was leaving, Plaintiff encountered Martin standing with a senior conductor, Marvin "M.E." King ("King"). King introduced himself and told Plaintiff he was "the mother-f***** around here."[2] (Pl.'s Dep.

---

[2]Martin disputes this testimony. According to him, "King said something to the effect of, 'Yes, my name is M.E. King, but they have a lot of other names for me on this railroad.'" (Martin Decl. ¶ 5, June 6, 2007.)

2

60:13-20, Ex. 7, Feb. 20, 2007.)  Plaintiff responded that she hoped to never hear anyone call him that, and she left the building. Plaintiff completed Phase I of her training shortly thereafter, and on June 2, 2005, she began her Phase II field training at the Columbus facility.

King was responsible for Plaintiff's initial Phase II training. Although he "appears very stern and gruff" and "often used profanity," King was assigned to ACT training because he "was a stickler for the rules and performance" and "would thoroughly train [the ACTs] in a job that is very dangerous."[3]  (Martin Decl. ¶¶ 7, 8; Charbonneau Decl. ¶ 5.)  When Plaintiff learned she had been assigned to train with King, she informed Charbonneau that King used profanity the first time she met him.  Charbonneau instructed Plaintiff to "let [him] know if [she had] any problems."  (Pl.'s Dep. 89:10-12.)

Plaintiff claims that King "consistently directed swearing and acts of rudeness toward [her] and made sexist remarks" throughout her Phase II field training in June 2005.  (Pl.'s Decl. ¶ 4, Aug. 6, 2007.)  Plaintiff complained about King's behavior to another conductor, and she was ultimately reassigned to train with Gordon Ellis.  Phase II of Plaintiff's training ended in early July 2005, at which time she left Columbus to complete Phase III.  Plaintiff returned in August 2005 to complete Phase IV of her training.

---

[3] According to Martin, "[s]ome people are intimidated by [King], and he uses that intimidation when training, similar to how a drill sergeant interacts with new recruits."  (Martin Decl. ¶ 8.)

3

On September 25, 2005, Plaintiff contacted Charbonneau to report an incident which occurred at a company cookout on September 22. According to Plaintiff, King threatened her in front of a coworker, Lamont Beard. (*See* Pl.'s Dep. 100:2-102:4.) Charbonneau immediately contacted Beard, who denied hearing the threat, and he attempted to contact King, who was out on a train. Charbonneau did not follow up with King because later that day, he was called to New Orleans to assist with damage associated with Hurricane Katrina. Charbonneau telephoned Martin from New Orleans, however, asking that he complete the investigation of Plaintiff's complaint.

Martin interviewed King within a few days of receiving Charbonneau's telephone call. King denied threatening Plaintiff at the September 22 cookout but told Martin "he may have been hard on Carter [during her Phase II training] because she . . . just wanted to sit on the train and ride, without calling out signals or doing any physical work." (Martin Decl. ¶ 10.) He also admitted that "he may have used profanity when speaking to Carter but [] he never cursed her directly or called her any names." (*Id.*) Martin met with Plaintiff on October 6, 2005, at which time Plaintiff provided him with "a three-page document full of accusations against King." (*Id.* at ¶ 13.) Martin "asked Carter a number of questions about the various incidents she described" and later "interviewed several individuals Carter mentioned." (*Id.* at ¶¶ 13, 16.) Although none of those individuals substantiated Plaintiff's claims, "[s]everal of

4

them did[ ] report that King used profanity more than the average person and occasionally yelled at his co-workers." (*Id.* at ¶ 16.) As a result, Martin "met with King on October 15, 2005[, ]counseled him regarding his excessive use of profanity and unprofessional behavior," and issued King a written warning. (*Id.* at ¶ 18, Ex. B.)

**III. Plaintiff's Leave of Absence**

In late October 2005, Martin received word that Plaintiff was telling her coworkers that "if she were injured . . . , she would sue the company so that she could buy her mother a new home." (Martin Decl. ¶ 21.) Concerned that these statements "indicated that Carter may ignore proper safety standards," Martin arranged to meet with her on October 29, 2005. (*Id.* at ¶ 22.) Plaintiff informed Martin that her comments had been taken out of context, and Martin ultimately determined that her statements, "though unprofessional, did not violate company policy." (*Id.* at 29.) At the end of the meeting, Plaintiff complained of being sick, and Martin told her to go home. He told Plaintiff he would call her the following week about returning to work.

A few days later, one of Defendant's trains was involved in a fatal accident in Birmingham, Alabama, and Martin was called out-of-town. On November 1, 2005, as he prepared to leave, Plaintiff called Martin and told him she had been to the doctor and was ready to return to work. Plaintiff told Martin she was taking prescription medication, and Martin was "concerned that [the] medication may

5

prohibit her from returning [to] work because conductor trainees work around moving freight trains and other potentially dangerous conditions." (Martin Decl. ¶ 24.) Martin informed Plaintiff he was going out-of-town and that he would have to call her back later.

Plaintiff again telephoned Martin on November 2 and 3, 2005. During their second conversation, she informed him that she had been prescribed a two-week dose of Amoxicillin. Martin "was immediately concerned because [Defendant] has a policy of prohibiting employees from operating train engines and other machinery while under the influence of certain prescription medication, especially antibiotics that could cause drowsiness." (*Id.* at ¶ 26.) He again told Plaintiff he would have to call her back when he had more time. Although he did not discuss the matter with Plaintiff, Martin "spoke to [his] superiors and received permission to pay Carter her regular salary of $500 a week during her leave of absence." (*Id.* at 30.)

Martin did not attempt to contact Plaintiff about her return to work until mid-November. When he was unable to reach her, Martin reported the situation to his superiors, who also tried to contact Plaintiff on numerous occasions. On November 22, 2005, Martin wrote a letter to Plaintiff "ask[ing] [her] to contact [him] so that [they] could meet and discuss continuing her conductor training." (Martin Decl. ¶ 34; *see also* Pl.'s Dep. Ex. 13.) Plaintiff did not respond to this letter, and on November 29, 2005, Defendant received notice from the Equal Employment Opportunity Commission that Plaintiff had

6

filed a charge of discrimination against Defendant. Plaintiff never returned to work, and Defendant terminated her employment on December 23, 2005. Plaintiff filed the present action on June 15, 2006, asserting claims under Title VII for harassment and retaliation.[4] Defendant now argues it is entitled to summary judgment on each of these claims.

DISCUSSION

**I.   Summary Judgment Standard**

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial. *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[4]Plaintiff first filed an unsigned complaint on June 9, 2006. The pleading dated June 15 corrects this error.

7

242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the Court may draw inferences from undisputed facts. The Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draws all justifiable inferences in his favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).

**II. Title VII Claims**

Plaintiff claims that she was discriminated against because of her gender and that this discrimination is actionable under Title VII. First, Plaintiff argues that she was subjected to gender-based harassment that was so severe and pervasive it created a hostile work environment. Second, Plaintiff claims Defendant retaliated against her for complaining of sexual harassment.

A.  Hostile Work Environment

Plaintiff first claims that, during her employment with Defendant, King subjected her to a sexually hostile work environment. In order to survive summary judgment on such a claim, a plaintiff must first establish a prima facie case of a hostile work environment: (1) that the plaintiff belongs to a protected group; (2) that the plaintiff was subjected to unwelcome harassment; (3) that the harassment complained of was based on her gender; (4) that "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) [that the harassment is] a basis for holding the employer liable." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (internal citation and footnote omitted). Defendant concedes that, as a female, Plaintiff belongs to a protected group. Defendant further concedes that Plaintiff was subjected to unwelcome harassment by King. Defendant argues, however, that the alleged harassment was neither based on Plaintiff's gender nor "sufficiently severe or pervasive to alter the terms and conditions of employment." *Mendoza*, 195 F.3d at 1245.

Plaintiff cannot survive summary judgment on her hostile work environment claim because King's behavior toward her, though unwelcome, was not sufficiently severe or pervasive to constitute actionable harassment under Title VII. "'Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary

tribulations of the workplace.'" *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (11th Cir. 1999)) (alteration in original). Title VII only provides a remedy for workplace harassment that is both subjectively and objectively extreme. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Harris Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); *Gupta*, 212 F.3d at 583. In other words, unless a "reasonable person would find [the harassing conduct] hostile or abusive," an employee cannot sustain a claim under Title VII. *Harris*, 510 U.S. at 21. A proper application of this standard "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted).

Even assuming that Plaintiff subjectively perceived King's conduct as abusive, Plaintiff must also establish that this subjective belief was objectively reasonable. To determine the objective reasonableness of Plaintiff's subjective beliefs, the Court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (citation omitted).

10

Giving Plaintiff the benefit of all doubt, the evidence shows that King: (1) introduced himself to Plaintiff as "the mother-f*****  around here" in early May 2005; (2) yelled and cursed at Plaintiff for being late to work and for performing her job duties poorly; (3) criticized Plaintiff for being out of shape, and told her she was inappropriately dressed to work on trains; (4) smoked cigarettes in Plaintiff's presence and blew smoke on her neck when she complained;[5] and (5) threatened Plaintiff in front of a coworker in late September 2005.[6] (*See* Pl.'s Dep. 60:11-25, 81:17-82:18, 100:19-102:7, 110:7-112:4, 114:17-117:9, Ex. 7, Ex. 12.) In short, Plaintiff complains of approximately five or six incidents scattered over a five month period. Generally, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788; *see also Miller*, 277 F.3d at 1276 (permitting harassment claim where plaintiff was subjected to ethnic slurs three to four times a day). Additionally, Plaintiff produced no evidence that King's behavior "unreasonably interfere[d] with [her] job performance." *Id.* at 1276. Plaintiff successfully completed her Phase II training in spite of King's conduct and had progressed to Phase IV by the time she

---

[5]Another conductor who worked with King during Plaintiff's Phase II training "never witnessed King blowing smoke at [her], and [stated] that the window was usually down when King rode the trains." (Baker Decl. ¶ 5, June 6, 2007.)

[6]Again, when Charbonneau spoke with Plaintiff's coworker about the incident, "he [did] not corroborate[] [Plaintiff's] allegations against King." (Charbonneau Decl. ¶ 9.)

11

complained to Charbonneau in September 2005.  Quite simply, King's behavior toward Plaintiff is far removed from the type of harassment courts generally deem to be actionable.

Plaintiff's claim also fails, however, because she did not produce evidence that King's behavior was gender-based or that Defendant is properly liable for his conduct under Title VII.  The content of King's statements is almost exclusively gender-neutral,[7] and Plaintiff admits that "the harassment . . . was not sexual in nature; that it was more profanity and yelling."  (Pl.'s Dep. 124:23-125:1.)  Additionally, although Plaintiff contends that King "directed more of his anger toward women and treated women worse than men[,]" (Pl.'s Decl. ¶ 9), there is no evidence to support her claim.[8]  Furthermore, Plaintiff cannot establish that Defendant failed to adequately respond to her complaints.  Plaintiff claims that Defendant "conducted a sham of an investigation and failed to take meaningful corrective action."  (Pl.'s Decl. ¶ 11.)  The uncontroverted evidence establishes, however, that Martin "met Carter at six or seven o'clock the morning of October 6[, 2005]" and

---

[7]The Court acknowledges that the comments related to Plaintiff's attire and physical fitness, viewed in the light most favorable to her, could be construed as gender-based remarks.

[8]Defendant presented numerous declarations from male employees establishing that "King 'often' spoke to people in an abrupt manner" and "did not treat Carter any differently than he treated any of the male trainees or any other male employee."  (Baker Decl. ¶¶ 3, 7; *see also* Hess Decl. ¶ 2, June 19, 2007; Williams Decl. ¶¶ 2-5, June 21, 2007.) Additionally, Plaintiff admits that King subjected at least one male ACT to the same harassing treatment she received during training Phase II. (*See* Pl.'s Dep. 90:21-91:10.)

"interviewed several individuals that Carter mentioned during [the] meeting[.]" (Martin Decl. ¶¶ 13, 16.) Despite the fact that "[n]one of the people [] interviewed substantiated Carter's claims that King had harassed and threatened her[,]" Martin issued King a written disciplinary warning. (*Id.* at ¶¶ 16, 18, Ex. B.) Plaintiff failed to establish that King's behavior was based on her gender, or that it was objectively severe and pervasive, and she failed to show that Defendant inappropriately addressed her complaints of harassment. Therefore, she failed to establish her prima facie case, and Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

### B. Retaliation

Plaintiff next claims that Defendant retaliated against her for complaining of sexual harassment. Specifically, Plaintiff argues that Martin refused to permit her to return to work following a medical absence in late October 2005. Again, a Title VII plaintiff must begin by establishing a prima facie case of retaliation. If the plaintiff establishes a prima facie case, the defendant then has the burden of articulating a legitimate, non-discriminatory reason for the challenged action. The plaintiff can then defeat summary judgment by creating a question of fact as to whether the defendant's reason is merely pretext for discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (citations omitted).

13

In order to establish a prima facie case of retaliation, a plaintiff must show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse employment action, and (3) that the adverse employment action is causally related to the protected activity. *Cooper v. S. Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). Plaintiff claims that she engaged in statutorily protected activity when she complained to Charbonneau, and later to Martin, about King's harassing behavior. Defendant argues that it is entitled to summary judgment because: (1) Plaintiff's complaints did not constitute "protected activity"; (2) there is no evidence that Plaintiff suffered an "adverse employment action"; and (3) Plaintiff failed to establish a causal connection between her alleged protected activity and the alleged adverse employment action.

Assuming, without deciding, that Plaintiff's complaints of harassment constituted statutorily protected activity, Plaintiff failed to establish her prima facie case because she failed to produce evidence from which a reasonable jury could conclude she suffered an adverse employment action. "Whether an action is sufficient to constitute an adverse employment action . . . must be determined on a case-by-case basis using both a subjective and an objective standard." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) (internal quotation marks and citation omitted). Plaintiff argues that Martin's failure to

14

permit her to return to work, and her ultimate constructive discharge, were so "materially adverse, . . . it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, __ U.S. __, 126 S. Ct. 2405, 2415 (2006) (internal quotation marks and citation omitted). It is undisputed, however, that Defendant never disciplined or demoted Plaintiff, never issued her a written reprimand, and never reduced her rate of pay. (*See* Pl.'s Dep. 79:14-21.) Although Martin told Plaintiff not to return to work while she was taking Amoxicillin, he also arranged for her to receive "her regular salary of $500 a week during her leave of absence." (Martin Decl. ¶ 30.) Defendant effectively placed Plaintiff on a paid leave of absence, and Plaintiff failed to produce evidence that being placed on a paid leave of absence would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *White*, __ U.S. __, 126 S. Ct. at 2415.

Furthermore, Plaintiff failed to produce evidence to support her claim of constructive discharge. To prove a constructive discharge, an employee "must demonstrate that working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (citations omitted). Here, there is no evidence from which a reasonable jury could conclude that Plaintiff's "working conditions were so intolerable that a reasonable

person in her position would have been compelled to resign." *Id*. The Court has already determined that the evidence does not support Plaintiff's claim of a hostile work environment. Additionally, there is no evidence that Defendant retaliated against Plaintiff for her complaints of harassment. Beginning in mid-November 2005, Defendant made numerous attempts to contact Plaintiff to arrange for her return to work. (Martin Decl. at ¶¶ 32-34; *see also* Pl.'s Dep. 151:7-153:5, Ex. 13.) Carter never responded to any of these attempts, and she never returned to work. "As a result, [Defendant] determined that Carter had voluntarily resigned and her employment was terminated effective December 23, 2005." (Martin Decl. ¶ 36.) Although Plaintiff had not worked since October 29, 2005, Defendant paid her full salary through December 23, 2005. (*See* Martin Decl. ¶¶ 22-36; Radford Decl. ¶ 3, May 15, 2007; Pl.'s Dep. 237:17-238:5.) Plaintiff failed to present evidence of an adverse employment action, and she cannot establish her prima facie case of retaliation. Thus, in addition to Plaintiff's claim of hostile work environment, Defendant also is entitled to summary judgment on her Title VII retaliation claim.[9]

---

[9] Even assuming Plaintiff established her prima facie case, Defendant is entitled to summary judgment for the additional reason that Plaintiff failed to provide evidence of pretext. Defendant contends that Martin refused to permit Plaintiff to return to work because she had been prescribed a two-week dose of Amoxicillin, an antibiotic known to cause drowsiness. According to Martin, he was concerned about Carter's medication "because conductor trainees work around moving freight trains and other potentially dangerous conditions and they must be fully attentive on the yard." (Martin Decl. ¶ 24.) Additionally, "NSR has a policy of prohibiting employees from operating train engines and other machinery

16

CONCLUSION

For the aforementioned reasons, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's Complaint (Doc. 27).

IT IS SO ORDERED, this  20th  day of December, 2007.

                                        S/Clay D. Land
                                         CLAY D. LAND
                                    UNITED STATES DISTRICT JUDGE

---

while under the influence of certain prescription medication, especially antibiotics that could cause drowsiness." (*Id.* at ¶ 26.) Apart from her own speculation as to why he refused to permit her return to work, Plaintiff presents no evidence which contradicts Martin's testimony.